# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
BOBBY JOHNATHAN PERDUE, II,   )
                              )
          Plaintiff,          )
                              )
     v.                       )         1:17cv403
                              )
TITUS HARRISON,               )
                              )
          Defendant.          )
```

## MEMORANDUM OPINION AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant's Motion for Summary Judgment" (Docket Entry 25) (the "Motion"). For the reasons that follow, the Court should grant the Motion.

## FACTUAL AND PROCEDURAL HISTORY

Bobby Johnathan Perdue, II (the "Plaintiff"), a pretrial detainee proceeding pro se, commenced this action pursuant to 42 U.S.C. § 1983 against Titus Harrison (the "Defendant") in his individual and official capacities, alleging that Defendant used excessive force against Plaintiff in violation of his fourteenth-amendment rights. (See Docket Entry 2 (the "Complaint") at 5.)[1] According to the Complaint:

On April 23, 2017, Defendant, a sergeant with the Rockingham County Sheriff's Department, conducted a search of Plaintiff's cell

---

[1] Citations to Docket Entry pages utilize the CM/ECF footer's pagination.

at the Rockingham County Detention Center. (See Docket Entry 2 at 4.) Upon finding contraband, Defendant ordered Plaintiff and his cell-mate to pack their belongings, and escorted them to segregation. (See id.) On the way, Plaintiff and Defendant engaged in a heated exchange. (See id. at 9.) Thereafter, Defendant ordered Plaintiff to enter an area closed off from other officers and beat him, resulting in injuries requiring medical attention. (See id. at 5, 9-10.)

Defendant moved to dismiss the Complaint on immunity grounds and for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (See Docket Entry 15 at 5-11.)

The undersigned recommended granting Defendant's dismissal motion as to the official capacity claim, but denial in all other respects. (See Docket Entry 23 at 16.)[2] Rather than objecting to the recommendation, Defendant moved for summary judgment (see Docket Entry 25), which Plaintiff opposes (see Docket Entry 30).

In regard to the Motion, Defendant primarily contends that his actions toward Plaintiff did not constitute excessive force. (See Docket Entry 26 at 7-11.)[3] As supporting evidence, Defendant presents affidavits from himself and three other officers present at the scene of the events at issue, as well as "Use of Force

---

[2] The Court (per United States District Judge Loretta C. Biggs) adopted that recommendation. (See Docket Entry 31.)

[3] In the alternative, Defendant argues that qualified immunity shields him from liability. (See id. at 11-14.)

Reports" prepared directly after the incident.  (See Docket Entry 25 at 4-23.)  Defendant also provided a surveillance camera recording of the incident accompanied by an affidavit from the custodian of the video surveillance tapes at the Rockingham County Detention Center.  (See id. at 36.)  Plaintiff submitted an unverified response contesting many of the facts set out in Defendant's affidavits.  (See Docket Entry 30 (the "Response").)  However, Plaintiff did not file any affidavits or other verified statements of his own.  (See Docket Entries dated May 3, 2017, to present.)

According to Defendant's affidavit:

Plaintiff's cell first drew his attention when he "noticed that the vents in Plaintiff's cell (G-113) were covered as against jail policy."  (Docket Entry 25 at 4.)  Defendant subsequently began a search of Plaintiff's cell after noticing "non-issued jumpsuits and excess linens in the corner of the cell constituting contraband and as against jail policy."  (Id.)  "Upon entering, [Defendant] saw additional contraband items," and, after having them removed, "asked Plaintiff and his cellmate if they had anything else they were not supposed to have."  (Id. at 5.)  After neither one responded, Defendant asked Plaintiff's cellmate, seated on the bottom bunk, to stand up.  (Id.)  Defendant lifted the mattress and found "five non-identifiable pills.  At that point, [Defendant] asked them both to step out of the cell so that a cell

search could be performed." (Id.)  Defendant radioed other officers for assistance and Officer McCollum responded and escorted Plaintiff and his cellmate to Booking.  (See id.)

Defendant then "determined that Plaintiff and his cellmate needed to be relocated to separate cells to await 'reclassification' as a result of the search findings." (Id. at 6.)  Defendant asked Officers McCollum and Snyder "to take the Plaintiff and his cellmate back to their original cell to pack their belongings so that they could be relocated to H-Pod housing." (Id.)  When Defendant entered the hallway ("sally port") between the pod housing units to "check on the progress [of] the cell relocation of Plaintiff and his cellmate," he saw Plaintiff and the other officers enter the sally port.  (Id.)  "Plaintiff was cursing and kicked the G-Pod exit door.  He also made comments about [Defendant's] wife and continued to act irate."  (Id.)  Upon entering the H-Pod, Defendant assigned Plaintiff a cell on the bottom level.  (See id.)  That cell "is one of three cells located behind a glass partition.  The block of three cells is separated from the glass partition by a short hallway known as the 'bubble.'" (Id.)

> Plaintiff and Defendant then entered the bubble, and Defendant instructed Plaintiff to go to cell H-108, which was on the far left side of the cell block.  Instead Plaintiff went to the right and turned around to face [Defendant] while holding his box of belongings.  He continued to state 'I am not going in there' and again asked 'why do I have to go in there?' several more times.  Plaintiff

-4-

> then shoved [Defendant] in the abdomen with [Plaintiff's] property box. [Plaintiff] then put his box down without being instructed to do so. Immediately upon rising, Plaintiff said 'I'm not trying to hear you!' and closed the space between [them] with closed fists and a challenging look in his eye. At that point, [Defendant]'s training indicators suggested that Plaintiff was about to become assaultive towards [Defendant] based on [Plaintiff's] body language, failure to follow instructions, and discontinued communication. [Defendant] braced himself for an attack. Then, [Defendant] executed a 'bear hug' around Plaintiff's upper body while cradling his right arm against [Defendant's] body and [Plaintiff's] head in the crook of [Defendant's] elbow to prevent him from being further injured as [Defendant] placed him on the floor.

(Id. at 7 (footnote omitted).) "At no point, did Defendant strike or choke [P]laintiff while restraining him and taking him to the ground." (Id.) Thereafter, "the other detention officers immediately came into the bubble to take over control of Plaintiff by placing him in handcuffs" and escorting him to Booking. (Id.) "Plaintiff was placed in a holding cell in Booking at that time. [Defendant] asked [Plaintiff] through the holding cell door if he was 'ok' and he responded 'I'm good.' [Defendant] looked to see if [Plaintiff] had any visible injuries at that time and he did not." (Id. at 8.)

According to Officer Jeremy McCollum's affidavit:

"Once inside the . . . []sally port[] between G-Pod and H-Pod housing, Plaintiff began making verbal statements such as 'this is bullshit' and 'fuck you' to the detention officers. He also made statements directly to [Defendant] about his wife." (Id. at 12.) "As he was going in to the bubble, Plaintiff stated 'pop my door

-5-

then [Defendant], pop my door.'" (Id. at 13.) When Plaintiff and Defendant entered the bubble,

> Plaintiff walked in the opposite direction [of his newly assigned cell] and turned around to face [Defendant]. They continued to have a verbal exchange. Holding his plastic box of belongings at waist level, Plaintiff then pushed his box into [Defendant's] abdomen. Plaintiff then dropped his plastic box and immediately advanced toward [Defendant] with a grimacing facial expression, thereby closing the distance between them as if [Plaintiff] were about to attack [Defendant]. [Defendant] executed an immobilizing technique ('bear hug') by wrapping his arms around Plaintiff's upper body and assisting him to the ground. [Defendant] did not strike or choke Plaintiff at any time while restraining him.

(Id.)

Officer Joshua Odell similarly avers that, once inside the bubble, "Plaintiff walked in the opposite direction [of his assigned cell] and turned to face [Defendant] with his box of belongings in his hands. . . . Plaintiff then used the plastic box to push into [Defendant's] abdomen and got up in [Defendant's] face. Plaintiff then put his box down on the floor and immediately rose in an aggressive manner and closed the distance between himself and [Defendant]. [Defendant] then took Plaintiff to the ground with an immobilizing technique similar to a 'bear hug' around his upper torso. Plaintiff was not choked or struck in any way while being restrained by [Defendant]." (Id. at 18.)

The remaining affidavit, from Officer Isaac Daniels, does not differ materially from the other affidavits. (See id. at 22.)[4]

**DISCUSSION**

**I. Summary Judgment Standards**

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "tak[es] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). In other words, the nonmoving "party is entitled 'to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, [and] all internal conflicts in it resolved favorably to him.'" Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (brackets in original) (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979)). If,

---

[4] Due to the surveillance camera's positioning, the video footage Defendant provided does not usefully capture the disputed events.

applying this standard, the Court "find[s] that a reasonable jury could return a verdict for [the nonmoving party], then a genuine factual dispute exists and summary judgment is improper." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). In response to a motion for summary judgment, "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . affidavits or declarations . . . ." Fed. R. Civ. P. 56(c)(1)(A). The responding party "may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "Nor can the nonmoving party 'create a genuine issue of material fact through mere speculation or the building of one inference upon another.'" Id. at 297 (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

Here, Plaintiff's Response does not constitute evidence that the Court can consider on a motion for summary judgment. The Roseboro Letter sent to Plaintiff on November 14, 2017, informed him that "[his] failure to respond, or if appropriate, to <u>file affidavits or evidence in rebuttal</u> within the allowed time may cause the [C]ourt to conclude that the [D]efendant['s] contentions are undisputed . . . ." (Docket Entry 29 at 1 (emphasis added).)

-8-

Statements such as those submitted by Plaintiff that "do[] not subject the author to the penalty of perjury for any misstatements" cannot by themselves defeat an opposing summary judgment motion. Turner v. Godwin, 1:15CV770, 2018 WL 284978, at *3 (E.D. Va. Jan. 3, 2018); see also United States v. White, 366 F.3d 291, 300 (4th Cir. 2004) (explaining that courts should not consider unsworn arguments as evidence in opposition to a summary judgment motion). Moreover, although a verified complaint may serve as an affidavit for summary judgment purposes, see, e.g., Smith v. Blue Ridge Reg'l Jail Auth.-Lynchburg, 7:17-CV-00046, 2017 WL 6598124, at *2 n.5 (W.D. Va. Dec. 26, 2017), Plaintiff submitted only an unverified Complaint in this case (see Docket Entry 2). Moreover, Plaintiff's documentary evidence (an arrest warrant and disciplinary form) do not detail the physical confrontation between Plaintiff and Defendant. (See Docket Entries 30-1, 30-2.)

As such, the only admissible evidence regarding the relevant incident remains the affidavits Defendant provided, rendering undisputed Defendant's version of events for summary judgment purposes. Nonetheless, "in considering a motion for summary judgment, the district court must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 409 n.8 (4th Cir. 2010).

**II. Analysis**

The Due Process clause of the Fourteenth Amendment protects pretrial detainees from an officer's use of excessive force. See Kingsley v. Hendrickson, ___ U.S. ___, ___, 135 S. Ct. 2466, 2475 (2015). In Kingsley, the Supreme Court observed that "pretrial detainees (unlike convicted prisoners) cannot be punished at all." Id., ___ U.S. at ___, 135 S. Ct. at 2475. Accordingly, a pretrial detainee can "prevail [on an excessive force claim] by showing that the [defendant's] actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" Id., ___ U.S. at ___, 135 S. Ct. at 2473 (quoting Bell v. Wolfish, 441 U.S. 520, 561 (1979)). Ultimately, a standard of objective reasonableness applies to a pretrial detainee's excessive force claim. Id., ___ U.S. at ___, 135 S. Ct. at 2472-73. The Supreme Court has provided several factors to analyze "the reasonableness or unreasonableness" of the alleged force used:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id., ___ U.S. at ___, 135 S. Ct. at 2473 (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). Although not exclusive, these factors

"illustrate the types of objective circumstances potentially relevant to a determination of excessive force." Id.

Against this backdrop, the first Kingsley factor (the relationship between the need for the use of force and the amount of force used) weighs in Defendant's favor. According to Defendant's affidavit, after the two men entered the bubble, Plaintiff "shoved [Defendant] in the abdomen with his property box." (Docket Entry 25 at 7.) Plaintiff then "put his box down without being instructed to do so," stood up, said "'I'm not trying to hear you!' and closed the space between [them] with closed fists and a challenging look in his eye." (Id.) The affidavits of other officers corroborate this account, stating (for example) that "Plaintiff . . . pushed his box into [Defendant's] abdomen. Plaintiff then dropped his plastic box and immediately advanced towards [Defendant] with a grimacing facial expression, thereby closing the distance between them as if he were about to attack [Defendant]." (Id. at 13; see also id. at 18 ("Plaintiff then used the plastic box to push into [Defendant's] abdomen and got up in [his] face. Plaintiff then put his box down on the floor and immediately rose in an aggressive manner and closed the distance between himself and [Defendant].").) In response, Defendant "executed a 'bear hug'" to restrain Plaintiff and place him on the ground. (Id. at 7.) Detention officers "are trained . . . to use this particular technique" to prevent inmates from striking the

officers while simultaneously avoiding dislocation of the inmates' elbows.  (Id.)  Defendant and the other affiants aver that Defendant did not strike or choke Plaintiff (see id. at 7, 13, 18, 22), contrary to Plaintiff's allegations in the Complaint (see Docket Entry 2 at 5).  In response to Plaintiff pushing his box of belongings against Defendant and assuming an aggressive stance, Defendant employed a maneuver intended to immobilize Plaintiff while minimizing potential injuries to him.  Under these circumstances, a reasonable relationship existed between the need for force and the amount of force Defendant used.

The second Kingsley factor (the extent of the plaintiff's injury) weighs in Defendant's favor.  According to the Complaint, Plaintiff suffered bruising, scrapes and abrasions, and a possible sprain, for which "[he] was p[re]scribed Ib[u]profen."  (Id. at 11.)  However, Defendant and his fellow officers maintain that Plaintiff did not suffer any visible injuries.  (See Docket Entry 25 at 8, 13, 22.)  Furthermore, after "Plaintiff was placed in a holding cell," Defendant asked [Plaintiff] "if he was 'ok' and [Plaintiff] responded 'I'm good.'"  (Id. at 8.)  Even if Plaintiff did suffer the injuries that he alleged, given that they merited treatment with only ibuprofen, his injuries appear to qualify as "relatively minor."  Greene v. County of Durham Office of the Sheriff Dep't, No. 1:14-CV-153, 2016 WL 4507355, at *10 (M.D.N.C. Aug. 26, 2016) ("It is possible for a reasonable fact-finder to

conclude on this record that [the plaintiff] suffered bruising, soreness, and a head injury. Nonetheless, the record reflects that these injuries were relatively minor, so [the second <u>Kingsley</u>] factor weighs in favor of the defendants.").

The third <u>Kingsley</u> factor (any effort made by the officer to temper or to limit the amount of force) favors Defendant as well. As noted previously, Defendant avers that he utilized the bear hug "to prevent [Plaintiff] from being further injured as [Defendant] placed him on the floor." (<u>See</u> Docket Entry 25 at 7.) In so restraining Plaintiff, Defendant did not strike or choke Plaintiff. (<u>Id.</u>)

Finally, the fourth, fifth, and sixth <u>Kingsley</u> factors (the severity of the security problem at issue, the threat reasonably perceived by the officer, and whether the plaintiff actively resisted) also weigh in Defendant's favor. The evidence demonstrates that Plaintiff behaved disruptively, refused orders, pushed his box into Defendant's abdomen, and then assumed a confrontational and aggressive stance. (<u>See</u> <u>id.</u> at 7, 13, 18.) Defendant notes that his "training indicators suggested that Plaintiff was about to become assaultive toward [him]," and Plaintiff had already behaved in an assaultive manner when he pushed his box into Defendant. (<u>Id.</u> at 7 (footnote omitted).) These circumstances indicate that Plaintiff's conduct posed a

-13-

security problem, and that Defendant reasonably perceived that threat.

In sum, all six Kingsley factors clearly weigh in favor of Defendant, precluding a finding of excessive force. The uncontested evidence shows that did not violate Plaintiff's fourteenth-amendment rights.[5]

## **CONCLUSION**

Defendant has established entitlement to judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 25) be granted.

                                                  /s/ L. Patrick Auld
                                                      **L. Patrick Auld**
                                **United States Magistrate Judge**

This 23rd day of April, 2018.

---

[5] As such, Defendant also would prevail based on qualified immunity. See Williams v. Ozmint, 716 F.3d 801, 805 (4th Cir. 2013) ("A qualified immunity inquiry involves two steps. A court generally considers first, whether a constitutional violation occurred, and second, when the court finds such a violation, whether the right violated was 'clearly established' at the time of the official's conduct.").